Judge Carr.*
In the year 1803, Robert Buchan made his Will, by which he *468 direclod (among other things) that his Executors should sell his lands, &c. and remit the proceeds of sale to his brothers, David and Jamen, residents of Scotland, to be equally divided between them.
This Will was admitted to Record in February, 1804, and in May following, the Executors sold the land, at public outcry, to the Appellant Selden. On the 10th July, 1S05, they executed a Deed for the land, which was recorded on the 9th December, 1805. On the 10th December, 1805, an Inquest was held by the Escheator, and a Jury, and this land was escheated to the Commonwealth, for defect of heirs of Buchan. In May, 1806, Selden filed a Monntrans de Droit in the Fredericksburg District Court, claiming the land under the Will, the sale, and the Deed of the Executors, and praying Judgment. An issue was made up, a trial had, a special verdict found, and in October, 1806, a Judgment on the verdict entered in favor of Selden: from this Judgment an appeal was taken, and in April, 1816, the Judgment was affirmed by this Court. Selden took possession of the land in 1804, immediately after his purchase, and has not been removed from it for a moment, 1)5' these proceedings. The Bill now before us is filed by the surviving Executor, to compel a payment of the purchase money remaining due with interest, and in default of paj'ment, to have a Decree for the sale of the land. The Answer admits the justice of the claim generally, but insists that under the particular circumstances, no interest ought to be paid. The Chancellor decreed that interest be paid from the dates when the different instalments became due, and ordered an account, and also a survey, the Answer having stated that a few acres within the bounds of the Deed, were at the time of the sale, and still continued in the adverse possession of another. The appeal is from this order.
The whole argument turned on the question of interest. In his Answer, Selden resists the payment of interest: 1st. Because ho was assured by the Executors, that he should have an unincumbered, indefeasible title, without which he would not have purchased. 2dly. That for ten years after he took possession, the title was in litigation, the defence of which cost him much trouble and money, and he was advised that he could not safely pay the purchase money while the title was in suspense. 3dly. That he was al ways ready and willing, after the money became due, to have paid it, if he could have been indemnified for the loss of the land. To these reasons, the Counsel, in the argument here, added another, to wit, that before Selden had notice of the Deed, the Inquisition had been found, the land escheated, and seized in law, (though not in fact,) into the hands of the Commonwealth, and if Selden continued in possession, *496 he Was an intruder, liable to the suit of the Commonwealth, and therefore could not be liable at the same time for interest on the purchase money.
With respect to the two first grounds, that the Appellant was to have an unincumbered and perfect title, and that he has been ten in about it, it does not seem to me that this furnishes any ground for withholding interest. The Executors ' have not broken their covenant: thejT sold the land to the Appellant, put him in possesion, and made him a Deed.- The Commonwealth then advanced a claim to the land, and commenced proceedings to recover it, but this was no breach of the covenant of the Executors. They undertook to sell and convey a perfect title to the land, but not that there should be no claimants who would sue for it What they undertook they have made good, for their title has thus far proved a perfect one. The trouble and expense of defending the suit, are what all must encounter, who are sued, and raises np claim either in Law, or Equity, against the Executors. The event has proved that there was no ground for the suit.
Thirdly. The Appellant was always ready and willing to pay the money, if he could have gotten indemnity. Without stopping •to enquire whether he had a right to require such indemnity in an executed contract like this, it is obvious to remark that, according to the best settled rules, the statement that he was ready and willing to pay, is wholly insufficient to protect him from the payment of interest. He was then in possession of the land, receiving the issues- 'and profits; he was also in possession of the money, the price of the - land, and it must be a strong and clear case which could protect him, under these circumstances, from .paying interest; a case, showing that he had a right to retain the money, that he did in fact keep it useless and unproductive by him, and that he gave the other party notice that it was thus unproductive. This is settled in many - esses. - Thus, in Powell v. Martyr, 8 Ves. 146, during the delay which took place in discussing the title, the purchaser had the money deposited in the hands of his Solicitor,- to be paid so soon as the ’ objections to the title were cleared, and he proved this, and also that his Solicitor told the Solicitor on the other side, that the money was ready; but the purchaser was in possession of the land, • and because he did not give notice that the money was lying unproductive, Sir William Grant lays it down as settled, that he must pay interest. This was a case, too, where the delay proceed- , ed from the vendor. See Sugd'en, 319-20-21. There are many other cases. In the case before us, the vendors were in no default: they had ¡mt the vendee in possession, and made a Deed conveying *471 him a perfect title; and though he states that he was ready and willing to pay, if he could get security for the title, he does not state that he gave the vendors notice of this; nor does he state, nor does-it appear in evidence, that in fact the money was ever for a moment lying idle. It must then be fallen that he was in the enjoyment both of the land and the money, and in all conscience he ought to pay interest, unless he he protected by the objection taken at the Bar, that by the finding of the Inquest, the land (in Law) was seized into the hands of the Commonwealth, and Selden became an intruder upon her possession, and liable to her for the rents and profits.
With respect to the Common Law doctrine of offices, the office of instruction, and the office of entitling, and whether the finding of the office of entitling carries the seizin and possession to the Commonwealth in all cases, or- in those only where the possession is vacant; these points were discussed at the bar with learning-and ability, but I shall not enter into an examination of them, as I think the point before us can be well settled by the Act of Assembly. The 7th section of our Law of Escheats, 1 Rev. Co. 295, says, “ And if the Inquisition be found for the Commonwealth, and there shall be any man that will make claim to the lands, he shall be heard without delay, on a traverse to the office, Monstrans de Droit, or Petition of Right; and the said lands, &c. shall be committed to him, if he show good evidence of his right and title to hold, until the right shall be found and discussed for the Commonwealth, or for the party, finding sufficient surety to prosecute his suit with effect, and to render and pay to the Commonwealth the yearly value of the lands, if the right be discussed for the Commonwealth.’* When the office in the case at bar was found, Selden was in actual possession of the land, and he did make claim to it, as his Monstrans de Droit, filed in the District Court, at their next.Term, shows. Being in possession of the land, he would of course continue to hold, until some attempt was made, under the office, to dispossess him. When such attempt was made, it would be time enough for him to avail himself of the terms on which the Act permitted him to retain possession; or, if no attempt were made to turn1 him out, the District Court perhaps might have required the security mentioned by the Law as a pre-requisite to his filing the Monslrans de DroH, and contesting the title of the Commonwealth. If this requisition had been made, it would have been time enough then, for him to have given the proper security; but no attempt to oust him was made; no security was required of him; the case went on, and he sustained his claim, and proved that the Commonwealth *472 had no pretence of title. Suppose he had been required, and had given the security directed by the Act; it would, in the event which has happened, have been of no effect, for the bond (as directed by the Law,) must have been on condition “ to prosecute his suit with effect, and pay the Commonwealth the yearly value of the land, if the right he discussed for the Commonwealth. ” Now, he did prosecute his suit with effect, and the right, so far from being discussed for the Commonwealth, was discused for him. Thus, if he had given a bond with surety, in any amount, he would completely have discharged it, by a compliance with the condition, and not a cent could have been recovered on it: and can it possibly be supposed that the Commonwealth, in the event which has happened, Would be better off than if bond with security had been given? That after the right had been discussed against her, she could have recovered from Selden the yearly value of the lands? Surely not: and if not, the argument falls to the ground. He was never liable to the Commonwealth for the yearly profits; he received them, and held the money, and I am most clear that he ought, on every principle, to pay the interest; and that the Decree be affirmed.
Judges Co alter, and Cabell, concurred, and the Decree was affirmed.

 The Pbesibekt did not sit in this cause, being connected with the Appellant: nor did Judge Gheeh, he having decided the cause in the Courtbelow.